# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOANNE C. CAMPBELL, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 5:13-451 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Joanne C. Campbell ("Campbell") seeks review of an adverse decision on her application for disability insurance benefits under the Social Security Act.

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Reviewing courts also must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

## II.  Background

Campbell completed high school and attended some college.  She held jobs as a quality control manager in a factory, a certified nursing assistant, a babysitter, and a bus aide for special needs children.  (T. 48, 52, 53, 55, 324, 382).

In 2008, Campbell alleged disability commencing October 1, 2003, due to fibromyalgia, back injury, and depression.  (T. 304).  Subsequently, she amended her onset-of-disability date to August 25, 2004.  (T. 367).

Campbell alleges that she suffers from pain in her shoulders, neck and spine.  (T. 54-55).  In 1998, she was prescribed Amitriptyline for fibromyalgia; it did not work very well and she began having problems with her memory.  (T. 56).  In addition to body aches and memory loss, she suffered from heart palpitations, and side effects from medication made her feel like a "zombie," dizzy, nauseous, and caused a rash and breathing difficulties.  (T. 57-58).  She switched medications to help her out, but she still suffered from pain, fatigue, and anxiety.  (T. 56-58).

After her claim was denied initially, she requested and received an evidentiary hearing before an administrative law judge, Vivian W. Mittleman, who denied Campbell's application.  (T. 78-114, 119-129).  The Appeals Council vacated ALJ Mittleman's decision and remanded the matter for a new hearing.[1]

---

[1]  In its remand order, the Appeals Council directed the administrative law judge to: (1) give further consideration to the claimant's maximum residual functional capacity during the entire period and, in doing so, to evaluate treating source opinion from Dr. Paul Fiacco, M.D.; (2) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base; and (3) make findings at steps 4 and 5 of the sequential evaluation process that are consistent and in accordance with applicable Social Security regulations and are supported by evidence of record.  (T. 135).

(T. 134-36). Upon remand, the claim was assigned to a new administrative law judge, Elizabeth W. Koennecke, who conducted a second evidentiary hearing. ALJ Koennecke received into evidence (a) testimony from Campbell and a vocational expert, Esparanza DiStefano, M.S., C.R.C., (b) forensic reports from treating sources, and (c) Campbell's medical treatment records.

ALJ Koennecke denied Campbell's application in a written decision dated March 20, 2012. (T. 22-37). Campbell filed a request to review with the Appeals Council. (T. 14-18). She also submitted to the Appeals Council a four-page "Addendum to Request for Review," wherein her counsel attached "New and Material Evidence" (T. 409-11), in the form of 38 pages of medical records from University Hospital, University Health Care Center, SUNY Health Science Center at Syracuse (hereafter "SUNY Health Science Center") from January 1998 through December 2000.[2] (Dkt. No. 17, p. 20 & Ex. B). Those records reflected Campbell's initial diagnosis of fibromyalgia and treatment thereof. (*Id*.). The Appeals Council "looked at" this evidence, but decided that it was not relevant to the period considered by the Administrative Law Judge (an alleged onset date of August 25, 2004, through the date last insured of December 31, 2007), and, therefore, only concerned "an earlier time." (T. 2).

The Appeals Council denied Campbell's request for review (T. 1-6). Campbell then instituted this proceeding.

---

[2]     Although Appeals Council acknowledged receipt of the material and obviously reviewed it, it inexplicably was not forwarded to the court as part of the official transcript. Campbell has attached it to her brief as an Exhibit, and the Commissioner has not questioned its authenticity. *See* Dkt. No. 17, Ex. B.

# III. Commissioner's Decision

ALJ Koennecke found that Campbell suffers from severe impairments of fibromyalgia, migraine headaches, and chronic obstructive pulmonary disease. (T. 26). She found that Campbell's impairments reduce her work capacity such that she can now work only at the sedentary exertional level in jobs with an option to sit and stand at will.[3] (T. 31). Relying on testimony from VE DiStefano, ALJ Koennecke determined that Campbell can no longer perform her past relevant work as certified nursing assistant because it requires capacity to work at the medium exertional level. (T. 34). Relying further on expert vocational testimony, ALJ Koennecke found that alternative and available jobs exist in significant numbers in the national economy that Campbell can perform. (T. 35-37). VE DiStefano testified that a person with Campbell's residual functional capacity can successfully perform work duties of a telephone solicitor, and information clerk, and order filler. (T. 36).

Based on this testimony and "under the framework of section 201.28 in the Medical-Vocational Guidelines,"[4] ALJ Koennecke concluded that Campbell was "not disabled" as of the date she was last insured (December 31, 2007). (T. 37).

---

[3] ALJ Koennecke's full residual functional capacity finding was:

After careful consideration of the entire record, the undersigned finds that, through the date last insured of December 31, 2007, the claimant had the residual functional capacity, during the course of an eight-hour workday, to lift/carry 10 pounds; stand and walk for a total of six hours; and sit for a total of six hours; but needed to alternate between sitting and standing at will.

(T. 31).

[4] The Medical Vocational Guidelines ("grids") are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996).

# IV.  Points of Alleged Error

ALJ Koennecke utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just method for determining disability applications.[5] At Step 2 of that procedure, ALJ Koennecke found that Campbell has certain severe impairments but that other alleged impairments were not severe.[6]  At Step 3, ALJ Koennecke found that none of Campbell's impairments have the degree of severity as to make them presumptively disabling under the Commissioner's "Listings."[7]  Campbell does not quarrel with either of these findings.

With respect to subsequent findings regarding residual functional capacity and Campbell's capacity to perform alternative and available work, Campbell argues that ALJ Koennecke committed multiple errors.  Restated (with minor grammatical changes) those proffered errors are:

1.    The ALJ's decision is not supported by substantial evidence;

2.    The administrative law judge committed reversible error by failing to adequately develop the record by unduly restricted the plaintiff's testimony at the rehearing at this matter; And, by not asking the plaintiff any questions regarding the plaintiff's fibromyalgia;

---

[5]    *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[6]    Medical evidence indicated that Campbell also has symptoms of lumbar strain, cervical strain, anxiety, depression, and hyperlipidimaia. ALJ Keonnecke concluded that they were either "non-severe and/or not "medically terminable impairments."  (T. 27).

[7]    The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). Listed impairments are presumptively disabling. See 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

3.  The ALJ committed reversible error in failing to cite favorable evidence in the record and or in failing to explain why such was not considered as part of the RFC determined;

4.  The ALJ committed reversible error in failing to appropriately utilize the factors of SSR 96-7p and 20 C.F.R. § 404.1529(c)(3) in assessing the credibility of the plaintiff;

5.  The ALJ commit reversible error by failing to properly utilize the factors set forth in 20 C.F.R. § 404.1527(c) in assessing the weight to be given to the opinion evidence; and

6.  The Appeals Council committed reversible error by misplacing the new and material evidence submitted with the request for review.

(Dkt. No. 17, p. ii-iii).

## V. Discussion

### A.  Preliminary Review

Campbell's scattergun attack contains several unmeritorious arguments that do not warrant extensive discussion. Administrative law judges need not cite every item of evidence on which they rely,[8] and absence of an express *citation* does not mean that there is an absence of *evidence*. Campbell's first point – which argues that, as a matter of law, a residual functional capacity cannot be supported by substantial evidence absent an express citation of evidence rebutting treating physician opinion – lacks merit. As the Commissioner rightly observes, an administrative law judge sometimes can rely on what the evidence does not show, in which event there is no evidence to cite.

Campbell's second point – that the evidentiary record was not developed adequately – also is unpersuasive. Upon remand, ALJ Koennecke wrote

---

[8]     *See Brault v. Social Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir.2012) ("An ALJ does not have to state on the record every reason justifying a decision," nor is an administrative law judge "required to discuss every piece of evidence submitted.").

Campbell's counsel and requested that he "contact [treating physician] Dr. Fiacco and obtain clarification of the opinions submitted." That letter also stated "[i]f it is not your intention to develop the evidence as ordered by the Appeals Council or to develop other evidence that would support the claim, please notify me in writing so that I may assist the claimant with the full development of their [*sic*] claim in accordance with the order." (T. 241). ALJ Koennecke did not receive any communication from the claimant's attorney requesting assistance in the development of Campbell's claim. (T. 23).

Campbell, even now, identifies no obvious gap in the evidence that precluded ALJ Koennecke from making a fully-informed decision. Because the relevant period at issue ranged from 2004 through 2007, it would have been futile for ALJ Koennecke in 2011 or 2012 to request updated consultative examinations and reports. While the record reflects that ALJ Koennecke became impatient with what she considered a too lengthy evidentiary presentation by Campbell,[9] she nevertheless allowed Campbell more than 45 minutes to present her evidence, and at the conclusion of the hearing, Campbell's counsel responded that he had "nothing else" to present. (T. 66, 77). In this proceeding, Campbell identifies no evidence she would have presented but for being cut off at the hearing, or other evidence that ALJ Koennecke should have developed before or

---

[9] When counsel questioned Campbell about when she stopped attending church every Sunday and why, ALJ Koennecke stated, "Counsel, I need to get to the vocational expert." (T. 64). Counsel then began asking questions about Campbell's physical abilities and, after a few minutes, ALJ Koennecke interrupted again, stating "Okay. Counsel, I have to get to the – you've already exceeded 45 minutes." (T. 66). "So I need to hear from the vocational expert and the next hearing starts at 11:00 . . . ." (*Id.*).

after the hearing.  Given these circumstances, Campbell's second point of error is not persuasive.[10]

Campbell's third point is similar in its focus to her first, and fails for the same reason.  She complains that ALJ Koennecke erred when failing to "cite" favorable evidence in the record or explain why it was not "considered" when assessing Campbell's residual functional capacity.  Campbell points to "numerous documents and [subjective] testimony" at both evidentiary hearings "indicating severe limitations to the Plaintiff's daily activities and past work efforts" that ALJ Koennecke failed to cite.  ALJ Koennecke, however, expressly stated that she developed her residual functional capacity finding, "after careful consideration of the entire record."  (T. 31).  Her failure to mention a particular item of evidence does not mean that it was not considered.[11]

While  administrative law judges cannot "cherry pick" only evidence that supports their findings while ignoring evidence from the same sources that

---

[10]    Under her second point of error, Campbell includes an unrelated Due Process argument that ALJ Koennecke's failure to interrogate Campbell regarding her fibromyalgia indicates that she had predetermined Campbell's residual functional capacity prior to hearing all evidence, and that Campbell's testimony was ignored.  She also makes an oblique argument that ALJ Koennecke's Step 5 finding is not supported by substantial evidence because the hypothetical question posed to VE DiStefano did not include all of Campbell's impairment-related limitations.

The Due Process argument is speculative at best.  There is nothing untoward in this type of administrative proceeding when an administrative law judge conducts a pre-hearing review of the documentary evidence and forms preliminary impressions about the issues for decision.

The Step 5 argument is a self-serving boot-strapping argument.  ALJ Koennecke included in her hypothetical question to the vocational expert witness all limitations which she found to be established by the evidence.  As such, the expert witness's testimony constituted substantial evidence.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983)

[11]    "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998).

detracts from them, such a deficiency rises to the level of a reversible error only when a reviewing court is persuaded that it reflects "so serious a misunderstanding of [the claimant's] statements that it cannot be deemed to have complied with the requirement that they be taken into account." *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010). In *Genier*, the Second Circuit found that "[b]ecause the ALJ's adverse credibility finding, which was crucial to his rejection of [claimant's] claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence,' . . . and cannot stand." *Id*. Here, careful review of ALJ Koennecke's decision does not indicate that she failed to consider all of the subjective evidence, but rather that she rejected much of it on credibility grounds, and she provided extensive reasons therefor. Campbell's third point, accordingly, does not warrant reversal.

B.    *Assessment of Medical Opinion and Subjective Testimony*

Campbell's fourth and fifth points argue that ALJ Koennecke's residual functional capacity finding is erroneous because she applied incorrect principles of law when weighing relevant medical opinion and subjective evidence pertaining to her fibromyalgia impairment as it affected her residual functional

capacity.[12]   Her sixth point argues that the Appeals Council erred by "misplacing" new and material evidence relating to her fibromyalgia.

Campbell's arguments on each point are pedestrian, somewhat misdirected and not particularly persuasive.  But, when considered collectively, they unearth serious issues.   An unavoidably prolix explication of the unique nature of fibromyalgia and the Commissioner's and reviewing courts' perspectives on its diagnosis and assessment of functional limitations resulting therefrom is necessary to frame these issues in proper context,.

1.   <u>Governing Principles</u>

a.   *Fibromyalgia*

Impairments generally are defined as "anatomical, physiological, or psychological abnormalities . . . *demonstrable by medically acceptable clinical and laboratory techniques.*"[13]   Applying this definition is a straightforward exercise with respect to most physical and mental impairments because they can be identified objectively through standard laboratory, imaging, physical

---

[12]     At Steps 4 and 5 of sequential evaluations, administrative law judges find whether claimants can still perform their past relevant work, and, if not, whether they can perform available alternative work.  Before making these determinations, they assess and articulate claimants' "residual functional capacity."  This term of art refers to what claimants can still do in work settings despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain.   *See* 20 C.F.R. § 404.1545. Administrative law judges thus decide whether applicants, notwithstanding their severe impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis.  When assessing residual functional capacity, administrative law judges must consider all of the relevant medical and other evidence, and *all* impairments, *i.e.*, both severe and nonsevere, must be factored into residual functional capacity determinations.   *See* SSR 96-8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

[13]     *See* 42 U.S.C. § 423(d)(3); 20 C.F.R. § 404.1508 (emphasis added).

examination and psychological diagnostic techniques. It becomes problematic, however, with respect to fibromyalgia, a medical abnormality consisting of a syndrome of chronic pain of musculoskeletal origin but *uncertain cause*.[14] Persons afflicted with fibromyalgia may experience severe and unremitting musculoskeletal pain, accompanied by stiffness and fatigue due to sleep disturbances, yet have *normal physical examinations*, *e.g.*, full range of motion, no joint swelling, normal muscle strength and *normal neurological reactions*.[15] Thus, lack of positive, objective clinical findings does not rule out the presence of fibromyalgia, but may, instead, serve to *confirm* its diagnosis.

### b. *Diagnosing and Assessing Functional Effects*

The Commissioner recognizes fibromyalgia as a potentially disabling impairment, and describes it as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *See* SSR 12-2p, TITLES II AND XVI: EVALUATION OF FIBROMYALGIA, 2012 WL 3104869, at *2 (SSA July 25, 2012).[16] This ruling provides guidance on the evidence required "to establish that a person has a medically determinable impairment of fibromyalgia" and

---

[14]     *See Green-Younger v. Barnhart*, 335 F.3d 99, 101 n.1 (2d Cir. 2003) (citing *Stedman's Medical Dictionary* 671 (27th ed. 2000)(defining fibromyalgia as "a syndrome of chronic pain of musculoskeletal origin but uncertain cause")).

[15]     See *Preston v. Secretary of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988).

[16]     This ruling was not yet in effect at the time of ALJ Koennecke's decision (*i.e.*, March 20, 2012). Nonetheless, as the Commissioner points out in her brief, it provides guidance as to how the agency would evaluate fibromyalgia through the use of diagnostic criteria. . . ." (Dkt. No. 30, p. 5).

how to evaluate the limiting effects of the impairment.  *Id.*, at *1.[17]  It also recognizes that diagnosis generally is reached by a process of *exclusion*, *i.e.*, eliminating other medical conditions which might manifest similar symptoms of musculoskeletal pain, stiffness and fatigue.  *Id.*, at *3 & n.7.

When fibromyalgia is established as a medically-determinable impairment, the Commissioner then makes a residual functional assessment. In that regard, all relevant evidence is considered, but *a longitudinal treatment record is of paramount importance*.  The Commissioner explains:

> When a person alleges fibromyalgia, *longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment.*

SSR 12-2p, 2012 WL 3104869, at *3 (emphasis added).   Later in this ruling, the Commissioner repeats:

> For a person with FM, *we will consider a longitudinal record whenever possible* because the symptoms of FM can wax and wane so that a person may have "bad days and good days."

*Id.*, at *6 (emphasis added).

---

[17]      In SSR 12-2p, the Commissioner recognizes two sets of criteria for diagnosing fibromyalgia, either of which can support a physician's opinion that the impairment was present. *See* SSR 12-2p, 2012 WL 3104869, at *2-3.  Essential to both sets of criteria are (1) findings of widespread pain, "that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least three months," and (2) evidence that other disorders that could cause the symptoms and signs had been excluded.  *Id.*

The first set of criteria, based upon the 1990 ACR Criteria for the Classification of Fibromyalgia, further requires the finding of "at least 11 [out of 18 designated] positive tender points on physical examination," which must be found bilaterally and both above and below the waist.  *See* SSR 12-2p, 2012 WL 3104869, at *3.  The second set of criteria, based upon the 2010 ACR Preliminary Diagnostic Criteria, requires "repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome."  *Id.* Under this second diagnostic method, "signs" include certain "somatic symptoms." *Id.*, at *3 n. 9.

c. *Jurisprudence*

From the judicial perspective, objective clinical findings are not always required in order to find an applicant disabled by pain.[18] And, particularly with respect to fibromyalgia, reviewing courts (well before ALJ Koennecke's decision in March 2012) recognized that fibromyalgia can be a disabling impairment that no objective tests can conclusively confirm.[19] A "mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability,"[20] but denying a fibromyalgia-claimant's claim of disability based in part on a perceived lack of objective evidence is reversible error. *See Grenier v. Colvin*, No. 6:13–cv–484 (GLS), 2014 WL 3509832, at *3-4 (N.D.N.Y. July 14, 2014). Similarly, discrediting treating source medical opinions and subjective testimony concerning limiting effects of fibromyalgia simply because such evidence is not corroborated by objective medical evidence is error. *See Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003). Thus, absence of medically-acceptable clinical and laboratory diagnostic findings (beyond clinical signs and symptoms necessary for a diagnosis) is a legally-improper basis for rejecting medical source opinion. Conversely, reliance on subjective complaints in fibromyalgia cases hardly undermines medical opinion

---

[18]    *See Donato v. Sec. of Dep't of Health & Human Servs.,* 721 F.2d 414, 418-19 (2d Cir. 1983) ("Subjective *pain* may serve as the basis for establishing disability, even if ... unaccompanied by positive clinical findings of other 'objective' medical evidence") (emphasis in original) (citation omitted); *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 1990); *Eiden v. Secretary of Health, Educ., & Welfare,* 616 F.2d 63, 65 (2d Cir. 1980); *Cutler v. Weinberger,* 516 F.2d 1282, 1286-87 (2d Cir.1975); *Cline v. Sullivan*, 939 F.2d 560, 566 (8th Cir. 1991).

[19]    *See Lisa v. Sec. of the Dep't of Health & Human Servs.,* 940 F.2d 40, 44-45 (2d Cir. 1991); *see also Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996); *Preston v. Secretary of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988).

[20]    *Rivers v. Astrue*, 280 Fed. App'x 20, 22 (2d Cir. 2008)(a "mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability").

as to functional limitations it produces because patients' reports of complaints and histories are essential diagnostic tools. *Id.*, at 107 (citing *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)).

2. <u>Medical Source Evidence Regarding Campbell's Fibromyalgia</u>

a. *Paul A. Fiacco, M.D.*

Campbell became a patient of CNY Family Care in January 2002, at which time she presented to Dr. Paul Fiacco, M.D., her primary care physician, for treatment with a history of fibromyalgia and migraines. (T. 587, 672). After treatment of Campbell for over eight years, Dr. Fiacco provided a comprehensive assessment of Campbell's fibromyalgia in a forensic "Fibromyalgia Residual Functional Capacity Questionnaire."[21] (T. 587-92). Therein, Dr. Fiacco found that Campbell met American Rheumatological criteria for fibromyalgia with positive responses in 12 of 18 "trigger" points. (T. 587). He identified Campbell's symptoms as: multiple tender points, non-restorative sleep, chronic fatigue, breathlessness, irritable bowel syndrome, frequent, severe headaches, female urethral syndrome, premenstrual syndrome, temporomandibular joint dysfunction ("TMJ"), muscle weakness, subjective swelling, numbness and tingling, anxiety, panic attacks, depression, mitral valve prolapse, carpal tunnel syndrome, and chronic fatigue syndrome. (T. 588). He assessed bilateral pain in the lumbosacral spine and cervical spine, minimal pain in the thoracic spine and chest, pain in her shoulders, arms, hands/fingers/wrists, bilateral pain in her hips and legs, and pain in her knees/ankles. (*Id.*). Dr. Fiacco opined that Campbell is able to walk only "limited" city blocks, can sit/stand for 1 hour a time before needing to get up, for a maximum of 2 hours in an eight-hour

---

[21] This document is not an official Social Security Administration or State Agency form; rather, it is an attorney-generated forensic item of evidence.

workday.  (T. 590).  Dr. Fiacco further stated that Campbell needs to walk around and must have the option to shift positions at will from sitting, standing, or walking as well as take unscheduled breaks every hour or less.  (*Id.*).  Dr. Fiacco opined that Campbell could occasionally10 pounds or less and never lift more than 20 pounds.  (T. 591).  Finally, Dr. Fiacco noted that Campbell's impairment is likely to have good and bad days, she could only bend and twist 20% on her "best days," and she could be expected to miss more than three days of work per month.  (T. 591-92).

Dr. Fiacco submitted three subsequent documents supplementing his questionnaire.  In August, 2011, he stated that he had been treating Campbell since 2002, and that it was his opinion that the limitations set forth in the questionnaire would be the same limitations that she has had since 1998.  (T. 635).  In December, 2011, Dr. Fiacco stated, "for your information, forms were filled out in my office by my nursing staff. However I reviewed the forms & concurred with the information, when I signed the forms."  (T. 671).  In January, 2012, Dr. Fiacco explained (in a letter to Campbell's counsel) that Campbell initially presented to his office with a history of fibromyalgia and migraine headaches; she had multiple complaints of chronic pain in her neck, back, upper, lower extremities.  (T. 672).  He referenced several medications that she tried without success.  (T. 673).  He then discussed the subjective-nature questions on the questionnaire and diagnosis of fibromyalgia.  (*Id.*).  He stated that "with this syndrome "no objective finding can be provided to the courts to substantiate Miss Campbell's complaints."  (*Id.*).  Finally, he opined that the disease is progressive and the degree of disability it causes worsens in time.  (*Id.*).

###### b.     *Dr. Patrick, J. Riccardi, M.D., F.A.C.R.*

In August 2009, on the referral from Dr. Fiacco, Campbell saw rheumatologist Dr. Patrick, J. Riccardi, M.D., F.A.C.R., for a consultation. (T. 463-64).  Upon examination, Dr. Riccardi observed "quite a bit of soft tissue tenderness over both forearms, especially the lateral epicondyles, and both shoulder girdle, especially the trepezius areas."   Dr. Riccardi's impression was that he agreed "with the diagnosis of chronic fibromyalgia pain syndrome." (T. 464).  Dr. Riccardi explained that Campbell lacks anything else by history or physical to point towards an evolving rheumatic disorder and Dr. Fiacco's screening work-up to date has been benign as well, noting that she already had an MRI of the brain to rule out other more significant neurologic conditions, and an ANA, rheumatoid factor, etc. (*Id.*).  Dr. Riccardi switched her medication, recommended conservative therapeutical treatments, and opined that a formal psychiatric consultation could aid in her treatment. (*Id.*).  Dr. Riccardi did not opine as to her functional abilities.

In October 2009, Campbell met with Dr. Riccardi for a follow-up appointment and management of her medication.  She complained of aching throughout her body.  She also noted that serologies came back positive for Lyme disease.  Dr. Riccardi observed upon examination "no synovial swelling or warmth to any joint, and "[t]here is mild soft tissue tenderness at the upper arms, lateral epincondyles." Dr. Riccardi adjusted her medication and recommended a six-week follow-up. (T. 462).  Campbell returned in December 2009, complaining to Dr. Riccardi of fatigue and intermittent joint pain involving her knees, wrists, back, and neck.  Upon examination, he observed no redness or warmth of any location.  "Soft tissue tenderness of her forearms, upper arms, and throughout her back."  (T. 461).

c.    *SUNY Health Science Center*

Physicians within this group treated Campbell for the period commencing January 7, 1998 through December 5, 2000. (Dkt. No. 17, Ex. B). Their records document in June 1998, Dr. Catherine Caldicott, M.D., opined that Campbell had 11 of 18 trigger points for fibromyalgia but was hesitant to diagnose before performing nerve conduction study. (Dkt. No. 17, Ex. B-1, pp. 8-9). In December 1998, Dr. Lisa Kaufmann, M.D. found upon examination for fibromyalgia points, 90% of were tender to palpation. (Dkt. No. 17, Ex. B-2, p. 2). Dr. Kauffman found that she met the criteria for fibromyalgia and started her on amitriptyline. (*Id*., p. 3). In February 1999, Dr. Jose Batile, M.D. noted probable fibromyalgia and that she seemed to be responding to amitriptyline. She had agreed to see a behavior doctor (psychiatrist). (*Id*., pp. 6-7). In June 1999, Dr. Amy Lazzarini, M.D., notes past medical history of fibromyalgia and better control with increase in medication. (*Id*., p. 12). In May 2000, Dr. Caldicott opines fibromyalgia well controlled. Continue on amitriptyline. (*Id*., p. 14). In December 2000, Dr. Caldicott reports same. (*Id*., p. 18).

This evidence was not before ALJ Koennecke; it was presented for the first time to the Appeals Council. As noted earlier, the Appeals Council rejected it as irrelevant to the period considered by ALJ Koennecke. (T. 2).

3.    <u>Subjective Evidence</u>

In 1998, Campbell began seeking treatment for complaints of weakness, lower extremity paresthesis, muscle and joint tenderness, neck pain, back pain, insomnia, depression, and tender points. (Dkt. No. 17, at Ex. B). Although diagnosed with fibromyalgia, medication initially helped her and Campbell worked full time for years thereafter (*i.e.*, 1998-99 as quality control manager in

a factory performing medium, semi-skilled work and 1999-2001 nurse's aid performing medium/heavy, semi-skilled work). (T. 55, 324, 382). As her symptoms became worse, in 2002, she changed jobs to reduce physical demands and became a baby sitter which was light/semi-skilled. (T. 324, 382). After becoming concerned about her ability to focus and fatigue while attending to a child, she changed jobs again reducing her hours in 2003-2004, to work part-time as a bus aide for special needs children which was medium/unskilled. (T. 52, 324, 382 ). Campbell testified that the reason she stopped working was her back pain and migraines got worse. (T. 49).

At the administrative hearing, Campbell testified that she experiences body aches and pain from her fibromyalgia across her lower back and spine, her legs, and in her neck. (T. 50, 57). She suffers from fatigue, heart palpitations, memory loss, and has difficulty focusing. (T. 52, 57). Additionally, bending is difficult. (T. 50). She uses a "grabber" to pick things up. (T. 65). She does not stoop, crouch, or kneel due to pain. (T. 65-66). She opined that in 2004, her pain was a six or seven out of ten, but it would reach a level ten five days a week. (T. 50-51). Her medication did not seem to help, and she suffered from medication side effects, including memory loss, rash, dizziness, nauseous, and breathing difficulties. (T. 56, 58).

She testified that she could shop for groceries for an hour, pushing the cart and standing, but had to have help carrying the bags. (T. 62). She could lift a gallon of milk. She could sit and watch her son's baseball for two hours, shifting positions. (T. 63). Her sister would come over to visit or she would visit a friend a few blocks over for a few ours. (*Id.*). In 2005, she stopped attending church because she was not able to sit through the service and control the pain. (T. 64). She can only sit for about an hour before she has to shift her weight, because her back, neck, and shoulder begin to hurt. (T. 96). Her pain level then would go up to an 8 or 10. (T. 97).

4.  <u>ALJ Koennecke's Credibility Choices</u>

Had ALJ Koennecke given controlling weight to treating physician Dr. Fiacco's opinions, she could not have found Campbell to have residual functional capacity for sedentary work.[22]  Similarly, had ALJ Koennecke credited Campbell's self-assessment of the intensity, persistence and limiting effects of her symptoms, a residual functional capacity for sedentary work would have been inappropriate.[23]  ALJ Koennecke, however, did neither.

ALJ Koennecke first concluded that Campbell did not meet her burden of proving that she suffers from a medically-determinable impairment of fibromyalgia.  ALJ Koennecke reasoned that treating physician Dr. Fiacco did no testing and made no objective findings regarding fibromyalgia, "but, rather, merely took the claimant's word for this diagnosis. . .".  (T. 26).  She also stated that "Dr. Fiacco's office notes for the most part does (*sic*) not even appear to be in his own handwriting," and "no examinations of the claimant were reported in other medical records from Dr. Fiacco's office for the period under adjudication . . ." (*Id.*)  She noted that a *neurological* consultation in June, 2009, (nearly two years after Campbell's last-insured date) "still did not result in any definite diagnosis of fibromyalgia . . .".  (*Id.*).  Nonetheless, ALJ Koennecke bafflingly

---

[22]  Dr. Fiacco's opinions regarding Campbell's limitations in walking, sitting, and standing are inconsistent with capacity for a full range of sedentary work.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). Sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day. *See* SSR 96-9, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK-IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 1996 WL 374185, at *3 (SSA July 2, 1996).

[23]  Campbell's testimony regarding pain and fatigue when sitting, walking, or standing for sustained periods are inconsistent with demands of a full range of sedentary work.  *See* n. 22, *supra*.

"conceded" that fibromyalgia "has been established as a severe impairment in the claimant despite all of these evidentiary deficits."[24] (*Id.*).

Having made this reluctant concession concerning Campbell's fibromyalgia *diagnosis*, ALJ Koennecke next weighed Dr. Fiacco's medical opinions and Campbell's subjective testimony regarding Campbell's *functional limitations*. She elected to give "little weight" to treating physician Dr. Fiacco's opinions (even though they were presumptively entitled to controlling weight) citing several reasons listed in the note below.[25] Principal among them were lack of

---

[24]    ALJ Koennecke felt duty-bound to treat fibromyalgia as a severe impairment because (a) the administrative law judge who conducted the first evidentiary hearing, ALJ Mittleman, found fibromyalgia as a severe impairment, (b) upon its first review, the Appeals Council did not address "the evidentiary deficiency," and (c) Dr. Fiacco prescribed medication and treated Campbell for fibromyalgia. (T. 26).

[25]    Reasons for giving little weight to Dr. Fiacco's opinions were:

• Dr. Fiacco's assessment "is clearly not an objective medical assessment of the claimant's functioning" and "there was no objective evidence to support these limitations";
• Dr. Fiacco's assessment is not a medical opinion but, instead, Campbell's own assessment, given that it was written in the first person;
• Dr. Fiacco's assessment as based solely on Campbell's subjective reporting;
• Dr. Fiacco's assertion that there is no objective evidence to point to regarding a diagnosis of fibromyalgia conflicts with the regulations as there are still requirements to establish this condition, such as tender points testing;
• Dr. Fiacco's opinion is not supported by acceptable clinical diagnostic techniques (based on treating notes and reports);
• Dr. Fiacco's opinion is inconsistent with the other substantial evidence of record;
• Dr. Fiacco's opinion is based entirely on the claimant's subjective reporting;
• Memory problems associated with fibromyalgia were not documented by mental status examination or psychological testing during the period at issue; and
• Dr. Fiacco stated that his assessment of Campbell's ability to function was based entirely on her subjective report. He did not know Campbell prior to her alleged onset date of fibromyalgia in 1998, and again simply took her reported history at face value. Therefore "to accord this opinion determinative weight, would mean that disability benefits are available for the asking from the date requested.

(T. 31-32, 34).

corroborating objective evidence and Dr. Fiacco's reliance on Campbell's subjective reporting instead of clinical testing.

ALJ Koennecke similarly discounted Campbell's subjective testimony, finding that her "statements concerning the intensity, persistence, and limiting effects of her symptoms prior to December 31, 2007 are not fully credible." (T. 32). ALJ Koennecke justified that conclusion by stating that Campbell's allegations are *unsupported by the objective medical evidence* and rebutted by the other evidence of record.[26] She summarized her assessment as follows:

> The undersigned has fully considered the claimant's subjective complaints of pain. In assessing the claimant's pain, the undersigned finds that the claimant's impairments could not reasonably be expected to cause the pain alleged by the claimant. The claimant's *lumbar spine MRI* made on April 8, 2009 showed essentially nothing. The results of the claimant's *EMG and nerve conduction studies* performed on May 11, 2009 were also normal.

(T. 32) (emphasis added, exhibit references omitted).

---

[26] ALJ Koennecke cited the following examples that "detract" from Campbell's credibility:

- Campbell testified that she was able to work outside of her home as a part-time bus attendant for an entire year subsequent to her amended alleged disability onset date of August 25, 2004, which fails to enhance her credibility;
- Campbell's husband testified (in 2010 hearing) that she was still able to go camping in 2007;
- Campbell has a poor work history. Campbell does not explain how her earnings could have increased after 1997 if her fibromyalgia had actually started, as per her contention, in 1998;
- Campbell's claim that she has been experiencing ongoing memory problems was not evidenced at her most recent hearing (2012), as she was able to calculate the ages of all four of her children back to April 2007; and
- Campbell's part-time work as a bus aide after her amended alleged disability onset date was at a greater-than-sedentary exertional level. ALJ Koennecke agreed with prior ALJ Mittleman that if Campbell could do more than sedentary work on a part-time basis prior to her date last insured, she would seem to have been capable of performing sedentary work on a full-time basis before December 31, 2007.

(T. 32-33).

# VI.  Analysis

Careful consideration of the evidence and ALJ Koennecke's decision reflects that correct principles of law were not applied in two significant instances.  The first error is not apparent at first blush; the second is obvious immediately.  Stated succinctly: (1) under the eccentric facts of this case, the Appeals Council erred when failing to receive and direct consideration of the new evidence proffered by Campbell; and (2) ALJ Koennecke erred in rejecting medical opinion and subjective testimony concerning functional limitations caused by Campbell's fibromyalgia for lack of corroborating objective evidence.

A.    *New Evidence Error*

ALJ Koennecke's assessments of Dr. Fiacco's and Campbell's credibility regarding functional limitations caused by fibromyalgia inevitably were colored by her core belief that Campbell failed to "establish fibromyalgia as a medically-determinable impairment."  Indeed, a fair reading of ALJ Koennecke's decision suggests that she disbelieved Dr. Fiacco's *assessment of fibromyalgia-related functional limitations* primarily because she doubted the correctness of  his *underlying diagnosis*.

Looking at Dr. Fiacco's records alone, one can understand ALJ Koennecke's circumspection.  The evidence before ALJ Koennecke, however, also contained a referral-consultant report from Dr. Riccardi, a consulting rheumatologist (the medical specialty most appropriate for managing fibromyalgia), containing a statement agreeing "with the diagnosis of a chronic fibromyalgia pain syndrome."  (T. 464).  ALJ Koennecke never mentioned this opinion, nor was there medical evidence to the contrary in the *existing* record.

The *new* evidence presented to and rejected by the Appeals Counsel as irrelevant also confirmed a diagnosis of fibromyalgia. Significantly, that diagnosis was based on positive identification of diagnostic tender points, the evidentiary deficit that ALJ Koennecke found absent in Dr. Fiacco's records. The fact that the original diagnosis of fibromyalgia by treating physicians at SUNY Health Science Center predated the period of time considered by ALJ Koennecke did not make it irrelevant. Since fibromyalgia, once established, is progressive and incurable, this new evidence was directly relevant to the issue of whether Campbell had, in fact, established fibromyalgia as a medically-determinable impairment.

Given ALJ Koennecke's disbelief in the validity of Campbell's fibromyalgia diagnosis and its demonstrable effect on her credibility assessments, the Appeals Council erred in not receiving the new evidence and remanding the matter to ALJ Koennecke for further consideration of it as well as the consulting rheumatologist's concurring diagnosis which ALJ Koennecke apparently overlooked. The new evidence was not cumulative; it was material; and good cause existed for not having presented it earlier. This was not a tactical attempt by Campbell to obtain an unfair second bite of the apple; it was a timely effort to address ALJ Koennecke's unforeseeable objection to Campbell's underlying diagnosis of fibromyalgia which had been accepted by ALJ Mittleman at the first evidentiary hearing and not challenged at the Appeals Council level.[27]

---

[27] A claimant may "submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision." *Perez v. Chater*, 77 F.3d 41, 44-45 (2d Cir. 1996); 20 C.F.R. § 404.970(b). The standard for receiving new evidence is (1) the proffered evidence is new and not merely cumulative of what is already in the record; (2) the proffered evidence is material, meaning that it is (a) relevant to a claimant's condition during the time period for which benefits were denied; (b) probative; and (c) reasonably likely to have influenced the Commissioner to decide her application differently; and (3) good cause exists for his failure to present the evidence earlier. *See Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).

Were ALJ Koennecke to review this new evidence and also existing evidence from the rheumatologist, Dr. Riccardi, one would anticipate that she would no longer doubt that Campbell established fibromyalgia as a medically-determinable impairment during the period at issue. Elimination of that doubt almost surely would have put different light on her residual functional capacity determination.

Had ALJ Koennecke's evaluative lenses not been clouded by *de facto* objection to the fibromyalgia diagnosis, her assessment of the longitudinal medical record would have shown that Campbell's alleged functional limitations were consistent with an expected course of the disease. Campbell's fibromyalgia symptoms originally were controlled through medication, and allowed her to continue working full-time for a substantial time. Eventually, medication became ineffective, and she reduced her efforts to part-time work. After a while, she stopped working altogether due to her symptoms.

Similarly, while Dr. Fiacco's records did not reflect tender-point testing, more deferential review likely would have resulted in a finding that over the course of eight years of treatment he observed widespread pain in all quadrants of the body, axio-skeletal pain persisting for at least three months, and evidence that other disorders that could cause Campbell's symptoms and signs had been excluded. In short, ALJ Koennecke would have had much less reason to doubt veracity of both Dr. Fiacco's and Campbell's respective opinions as to functional limitations caused by fibromyalgia.

B.    *Objective Evidence Error*

Even under existing evidence, ALJ Koennecke erred when discrediting Dr. Fiacco's medical opinion and Campbell's subjective evidence for a perceived lack of objective corroborating evidence. In *Green-Younger*, an administrative law judge rejected both treating physician opinion and subjective evidence regarding

fibromyalgia and limiting functional effects occasioned by its symptoms for a perceived lack of objective corroborating evidence. The Second Circuit held that in so doing, the administrative law judge applied an erroneous legal standard. *Id.,* 355 F.3d at 109.

Here, as in *Green-Younger*, ALJ Koennecke's determinations largely turned on a perceived lack of objective evidence. ALJ Koennecke repeatedly noted that Dr. Fiacco's opinion was not "an objective medical assessment of the claimant's functioning," "there was no objective evidence to support these limitations for the claimant, his opinion "is not supported by any acceptable clinical diagnostic techniques" and was, instead, "based entirely on claimant's subjective reporting." (T. 31-32). But, as *Green-Younger* teaches, absence of medically-acceptable clinical and laboratory diagnostic findings (beyond clinical signs and symptoms necessary for a diagnosis) is a legally-improper basis for rejecting medical source opinion. It further instructs that reliance on subjective complaints in fibromyalgia cases hardly undermines medical opinion as to functional limitations it produces because patients' reports of complaints and histories are essential diagnostic tools. *Green-Younger,* 355 F.3d at 107 (citing *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)).

ALJ Koennecke expressed another reason for discounting Dr. Fiacco's opinion, stating that it was "inconsistent with the other substantial evidence in the record." (T. 32). ALJ Koennecke, however, fails to cite to any other evidence of record with which it conflicts. In contrast, evidence of record *supports* Dr. Fiacco's fibromyalgia diagnosis. In August 2009, on the referral of Dr. Fiacco, Campbell met with rheumatologist Dr. Riccardi, for a consultation. (T. 463-64). After examining Campbell, Dr. Patrick, J. Riccardi,'s M.D., F.A.C.R., impression was that he agreed "with the diagnosis of chronic fibromyalgia pain syndrome." (T. 464).

ALJ Koennecke also employed improper reasoning when finding that Campbell's subjective allegations of pain and functional limitations were not fully credible. She cited an April, 2009, magnetic resonance imaging (MRI) report as showing "essentially nothing,"[28] and May, 2009, electromyogram (EMG) and nerve conduction studies that were "normal." (T. 32). As the governing circuit court has stated, these reasons "simply do not undermine [a claimant's subjective] credibility" in fibromyalgia cases. *Green-Younger*, 355 F.3d at 108. Indeed, ALJ Koennecke's reference to Campbell's essentially negative imaging records suggests a fundamental misunderstanding of how fibromyalgia generates chronic pain without positive findings.

ALJ Koennecke thus erred in the manner in which she discounted Dr. Fiacco's physical residual functional capacity assessment and Campbell's subjective testimony.

## VII.  Harmless Error

The errors identified above were not harmless. They deprived Campbell of a substantial right to have her claim adjudicated according to correct principles of law. Nor can a reviewing court conclude that the result would have been the same absent these errors. Had ALJ Koennecke not discounted Dr. Fiacco's physical residual functional capacity assessment and Campbell's subjective testimony for lack of corroborating objective evidence, a finding of "disabled" might have been compelled under the evidence. Consequently, remand is necessary.

---

[28]    The MRI actually revealed a mild annular bulge into the left foramina L4-5, without compression of the exiting nerve. (T. 437). "[I]t is well-settled that the ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion." *See Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998) (internal citations omitted).

## VIII.  Closing Observation

The only intended inference to be drawn upon remand from the foregoing analysis is that (1) medical opinion and subjective testimony relating to functional limitations attributable to Campbell's fibromyalgia, (2) Campbell's residual functional capacity and (3) Campbell's alleged disability due to fibromyalgia must all be assessed without regard to whether corroborating objective evidence exists.

Nothing herein should be cited or construed as a directive or intimation from the court that, upon remand, the Commissioner is bound to give controlling weight to treating physician opinion regarding Campbell's functional limitations attributable to fibromyalgia.  There may be ample reasons other than lack of objective corroborating evidence for continuing to discount Dr. Fiacco's opinions on that issue.  Similarly, there may be ample other reasons for continuing to discount Campbell's self-evaluation of intensity, persistence and limiting effects of her symptoms.

The undersigned is aware that in each instance, ALJ Koennecke did cite reasons other than lack of objective corroborating evidence for not finding Dr. Fiacco's and Campbell's testimony credible.  Those reasons, however, were obviously secondary, and were entwined with principal, erroneous reasons given by ALJ Koennecke for discrediting this testimony.  As such, it would be improper for the court to affirm ALJ Koennecke's credibility choices on those subaltern and interdependent grounds.

## IX.  Recommendation

The Commissioner's decision should be REVERSED, and the case REMANDED pursuant to 42 U.S.C. § 405(g), sentence four, with instructions to

admit into the evidentiary record the medical SUNY Health Sciences Center records that were "looked at" by the Appeals Council, but misplaced and not made part of the administrative transcript (*i.e.*, Doc. No. 17, Ex. B ).   The Commissioner should further be instructed to (a) reassess credibility of treating physician opinion and subjective testimony in light of the new evidence and existing evidence from the consulting rheumatologist, and (b) redetermine Campbell's residual functional capacity, all without regard to whether objective corroborating evidence of fibromyalgia and its limiting functional effects exists.

## X.   Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___14___ day of ___November___ 2014.

_____
Earl S. Hines
United States Magistrate Judge